System Protection Board, Villareal v. Bureau of Prisons, case number 172275. Ms. Mendoza, you want five minutes for rebuttal? Okay, you may begin. May it please the court, good morning. We brought this appeal to challenge the arbitrators award in confirming the agency's decision to terminate Mr. Villareal in his position at the Bureau of Prison. I think the arguments that we raised in our brief are pretty well developed. I want to emphasize, though, that during the period of time that the investigation was taking place, and as we informed in our brief, it was 1,265 days, Mr. Villareal was assigned to a position that is called phone monitor. And what are the duties in that position? The duties are... In 1,200, what is it, 65 days? Yeah, 60 days. In 1,265 days, is that out of keeping with the delays? It seems to me that there's information in the record that shows that there was significant delays almost in all of these type of cases that are before the Bureau. Was it out of place or was it rare? The memorandum that was issued by the director regarding the timeliness of the investigations was supposed to fix the problem that had been presented for years in the Bureau of Prison. So that's why the memorandum was issued to tell all CEOs of all the institutions, you have to provide a timely investigation to the employee. The memorandum recognizes... Yes, that there's a problem. There's an overall problem. There's an overall problem. But for Mr. Villareal, was his delay out of keeping with them? Yes. Was it more than the regular type of delay? I've been an attorney for the union employees since 2002, and I usually see a delay of a year, a year and a half. To have three years and almost five months of a delay is the first time I ever see this. And it's actually the first time even for a year, year and a half delay that I've had an arbitrator decide that even if it's untimely, I don't care because it didn't cause any harm to the employee. As a matter of fact, everyone in the union has been paying attention to this case because they were like, how is it possible that you lost an untimely discipline case? Because all the cases that we've had with prior arbitrators in the European prisons have reversed that discipline because of the amount of time, as I mentioned. There are cases that take a year and a half, two years, but to have three years and five months, it was totally... In order to show that the delay vitiates the decision of the arbitrator, you have to show some sort of harm. Yes. The delay itself is harmful. Yes. And my argument is... I'm having a hard time finding that in your brief. I will clarify this and it is somewhere in our brief. But didn't the arbitrator hold that in front of him, you had not made a showing of harm? Yes, we did present in our brief the fact that there was a change in deciding official. So we have the warden... I understand there's a change, but I think what Judge Reina is asking for is harm to your client as a result of delay. My understanding is that your client was paid, was kept on duty, they took his gun away or whatever, but he continued to have a job and benefits and all of that, all during this time period. Yes. The problem with that is that we made a request for the lack of overtime. Remember that when we request that a decision or a discipline be overturned, we want the employee to be put back in the same place as if... Haven't we held that premium pay cannot be factored into a reduction in pay argument? In other words, the fact that you can't get overtime doesn't mean that there was actually a penalty. Yes, but because the delay was so long, I mean, I understand that that is the argument. He was not allowed to work that overtime. If this would have been decided when Mr. Babcock was the warden, Mr. Babcock, we understand that Mr. Babcock's conversation with Mr. Rosario, Mr. Rosario, I'm sorry, that the employee was going to get 30 days and they acted... The harm you're pointing out is a fiscal and economic harm to your client. It's not a physical harm. It's an economical and reputation-wise harm. I meant fiscal as in economic harm. It cost him money. Of course, and we requested back pay. That's the harm that you're... Yes. But that's not the law that we have. You have to show harm in that, but for that harm, another decision or opposite decision would have been made. Well, our position is the change of deciding official. If that decision would have been made within the time period that was supposed to be made, Mr. Villarreal would have been suspended only for 30 days. And we can argue that we have Mr. Babcock allegedly telling Mr. Rosario it's a 30-day suspension, and then we have Mr. Pierce saying, no, Mr. Babcock told me that this is a potential termination. So we have both hearsay there, right? But the only direct evidence that cannot be... But the arbitrator made a specific finding of fact, that the original warden's decision was never made final, right? That is correct. That is correct. It was a draft. We have held that where a new fact finder or decision maker has the exact same information before him or her as the old decision maker, that there's no due process problem with the decision makers. I understand. But here we have such a drastic change of disciplinary measure to be involved. I mean, it was only to be supposed to be a 30-day suspension versus a termination. And they had him over in phone monitors for the alleged egregious violation of the calls, et cetera. And what he was doing in the phone monitors was to monitor phone calls of inmates with their families. And it was ironic to find that even though Mr. Pierce found it so egregious that he was making phone calls on behalf of this inmate, that the temporary assignment pending investigation was to monitor the inmates' phone calls that they made to their relatives and so forth. So the egregiousness fact that the arbitrator... We don't know why he was given that assignment though, right? Well, he was given that assignment pending investigation because... No, no. But I mean, while the investigation was pending, he was given the assignment to monitor these calls. Right. And you're making a point out of that, but I don't understand what the point is. It may have been that they wanted him to monitor those calls so he could listen and hear all the bad stuff and then appreciate why it is he shouldn't have done what he did. Unless I have a reason to know why they gave him that job... The reason? But I don't see that in the record. It doesn't help me to think that you're making an argument out of the assignment that he was given. The thing is that the phone monitor position is outside the institution as such. It's in another building. So they took him out of the building where the cells are and they placed him in another area where they give training and so forth. But the master agreement allows them to do that if they have lost confidence in his ability to operate within the building where the cells are. Understood. But my point, Your Honor, is that it doesn't make sense to find him guilty or sustain the charge that he was a threat to the institution or to the safety and using that argument to monitor a phone call. But if he isn't monitoring the phone, he doesn't have any type of contact with the inmates. And the purpose of having him monitor the calls is to get him out of the prison setting, away from the inmates, and now he's just monitoring calls. Right. But in that position, Your Honor, we... You're arguing that monitoring the calls equals contact with prisoners. It could translate to that because he could have... But it doesn't translate to that. On the one hand, he's day-to-day contact with prisoners and that got him in trouble. And he's placed outside of the prison walls into another building where he has zero contact with prisoners. That is correct. But the fact that... The way that he's placed is in a place where all the correctional officers are going to the training center. So he had a desk in front of that training center. All the officers saw that he was there. On the other hand, the fact that he was listening to all these phone conversations, I under... It's our position that he was exposed to have information from inmates and from their relatives that he could have used to communicate with other officers. I mean, there's... I'm not sure how relevant this is, but it's also not in your briefs. So let's focus on what's in your briefs. With respect to Mr. Babcock, how do you know that he had made a final decision, that 30 days was final? Well, we don't have a final decision because the draft letter was not signed and was not issued. We do have the draft... It was signed and it wasn't sent. Right. But it was discussed with the union's president, Mr. Jose Osorio, and it was... The decision was included in that. Did you seek to depose any of these witnesses or to present any of these witnesses during the arbitration process? Under the master agreement, the agency is not going to provide the master agreements. They were retired, right? Yeah, because these people were retired and... Agency has a rule that they don't have to bother people once they've retired. Because they are not management anymore. And that's part of your argument about the delay. The delay was so long. Everybody retired. Everybody involved in case retired. And ultimately, you weren't able to subpoena them to come in. And that's your due process argument as well. Correct. Okay. You're into your bottle time. You want to save it? Yes. Thank you, Your Honor. May it please the court, I'll address first the timeliness argument that the court has interest in. In Coronado versus Nutt, the Supreme Court pointed out that if there is a procedural violation, it is only of consequence if there is a demonstration of prejudice. And for example, in the Cornelius versus Hunt, one of the procedural violations that was alleged was a delay between the time that the agency became aware of the misconduct and the time it issued the notice of proposed adverse... In this case, that delay is 1,265 days. There's 1,265 days from the date that he was notified, that Mr. Riera was notified about the charges to the time he was terminated. During that time, people retired, people relocated, and the thing dragged on. Why shouldn't we not find that Mr. Riera's harm was prejudice, or at least had his due process rights violated by the delay caused by the Bureau? First of all, as pointed out in the Supreme Court case, it's the employee's burden to demonstrate the harm, to demonstrate the prejudice. Well, one of the pieces of prejudice is that the employees who apparently were contemplating only a 30-day suspension had retired, and so they were no longer accessible, and that you end up having a new decision-maker who comes in to clean house. So why isn't the delay? I mean, they do cite prejudice. Your Honor, respectfully, they made no argument of prejudice to the arbitrator, and the arbitrator made that finding a fact in his decision, that there was no assertion of any prejudice before the arbitrator. That's a finding of fact by the arbitrator, supported by the proceedings before the arbitrator. These are new arguments being raised here. Now, to address the new arguments... Not only being raised, but being developed by the bench. Yes, Your Honor.  Just to have the record clear. Yes, Your Honor. But to address the court's questions, in light of the record that was before the arbitrator. What the arbitrator had before him was testimony from Warden Pierce, and also from the union president. And as the arbitrator pointed out in his decision, he had testimony from the union president that Warden Babcock had made a statement to him in August of 2014, that it looked like he had a suspension case in front of him, with regard to Mr. Villareal. Warden Pierce's testimony was different. He testified that in November of 2014, there was a meeting between Warden Babcock and himself. A transition meeting, which is traditional in the prisons. When a prison is going to be transferred from one warden to the next warden, there is a transition meeting. And in this transition meeting, Warden Babcock told Warden Pierce that he had a termination matter. Potential termination matter. That's how he described it. And also made the comment... Now, these people that are testifying, were they former employees? Excuse me? This testimony that you're talking about, that was now, was in front of the arbitrator. Right. Because earlier we had, in the air, the notion that there hadn't been any testimony in front of the arbitrator on this issue. There was testimony from Warden Pierce. I'm recounting the testimony... He's the deciding official. Yes, he's the deciding official. And he had this meeting in November of 2014, where he's told by Warden Babcock that he has a termination matter or a potential termination matter. If the court will recall... Was it hearsay? Yes, it is hearsay. But it wasn't challenged? No. It wasn't challenged by Villareal as hearsay? Well, as the arbitrator said, it was hearsay in both instances. The union president was relating hearsay. The warden was relating hearsay. And it appeared to the arbitrator that if both were true, that perhaps Warden Babcock had changed his point of view by the time they have this transmission meeting in November of 2014. Or hadn't really made up his mind? Yes. Which might explain why he hadn't issued the draft. The draft... Warden Pierce was shown that draft during the... Right, but what I'm saying is the possibility of a change of mind... Yes. ...the person that wrote the draft, and the fact that they hadn't issued it might go to the fact that he did have a change of mind. Whoever wrote the draft, as Warden Pierce pointed out. Whoever wrote it, somebody changed their mind somewhere along the way, perhaps. But Warden Pierce also testified that when he comes on the job in January of 2015, and before the official notice of proposed removal goes out under the signature of Captain Furrer, who is the department head. He's two levels above Mr. Villareal. But Warden Pierce points out that he was told by the captain that he was sending out a notice of proposed removal. That was the captain's decision.  And the proposed discipline that goes in the notice of proposed removal, that's the captain's decision. And he was informed by the captain that it was going to be a termination, and then eventually... The captain was the same throughout? Yes, the captain... So we don't have a new captain. No, there's no new captain. He's the same individual throughout. And he maintains to Warden Pierce that it's going to be a termination, and he issues it as a termination. And then it comes to Warden Pierce for decision. And the captain was still a current employee of the ADC at the time this was... At the hearings going on? At the time it's going on. He's not an employee at the time of the arbitration hearing. Right, so he didn't testify either. No, so he did not testify. But his decision is not at issue. What's at issue is the decision of Warden Pierce, who, of course, could either adopt the captain's point of view or totally disagree with the captain as to the charges or the discipline. Now, there was initially questions about the time frame. I did want to address that with a little bit more specificity so I could explain to the court how this time frame evolved. Initially, the report of misconduct is made by an inmate. It comes into the Bureau of Prisons. When something like that comes in, it goes to, first of all, the Bureau of Prisons Department of Internal Affairs. And that was done... The referral to Internal Affairs is done December 6, 2012. It takes about a month to go from Internal Affairs, then to the Office of Inspector General. And it only goes to the Office of Inspector General because there's possible criminal activity on the part of the officer. And that's why it goes to the Office of Inspector General. Now, once it gets to the Office of Inspector General, they take seven months to conduct their investigation. The summary of investigation is in our appendix. And what it points out is the number of people and the individuals interviewed, the people that they tried to interview, that refused to give interviews, the subpoenas to all the telephone companies that then had to be responded to. And these phone records come back and they show... They're for his cell phone. They show every single call on the cell phone. They show when the time, the time of the call, when it started, when the call ended, the duration of the call. And then they had to go through those calls. That's 210 days. Excuse me? That's seven months is 210 days. Yes. Yes, Your Honor. That's after it's been... That's at the IG's office. A certain amount of time was used up at the internal affairs, right? 30 days to get it to the IG and then seven months at the IG's office. And after the IG does all this investigation... They still have another 1,000 days to go anyway. And they have to itemize. They have to compare the calls and find the calls that go to the... Okay, but this is during the seven-month period. Right. They have to show that... And this is all trying to decide whether a criminal act occurred? Well, yes. They do this in cooperation with the Assistant U.S. Attorney's Office. That's the focus of the attention in the IG's office is whether there's been a criminal offense. Correct. Correct. And that's being very careful to make certain that they don't charge someone with a criminal offense when they shouldn't. Correct. Okay, so that's all done. You still have another 1,000 days. What happens then? Okay. I would just point out that before I get to the next period, what the collective bargaining agreement says is that you may not propose any discipline at all while an investigation is pending. I got that. We still have 1,000 days left. Right. After that, there is an extensive review period. The report of the IG doesn't tell you what charges to bring. Somebody has to analyze it and decide. So who's analyzing it at this point? The captain. It's the captain's responsibility to analyze and decide which charges do we wish to bring and what is the... The conclusion of the IG's report is we're not going to refer to this for criminal prosecution. Correct. That's their sign-off. And then they hand everything over to the captain and say, if you want to do something, it's up to you. Right. Right. And the IG investigator testified before the arbitrator that he made no recommendations. And so then it's up to the captain to decide what the charges are. So it takes time for the captain to go through this report. I will point out that the OIG report... Three years? Excuse me? Three years to go through the report? I'm not suggesting it took the captain three years to get through it. But there is a review process. There is a... I did want to point out... When does the warden change? The warden... There are two warden changes, right? There are two warden changes. The turnover, Warden Babcock leaves in approximately December of 2014. Typically, does the captain talk with the warden about this? We have the testimony... The captain's sitting down there and the warden is his boss, right? We have the testimony from Warden Pierce. And Warden Pierce testified as to the transition meeting that I already went through. And he testified that when he got to the job in January 2015, and before the proposal was issued by the captain in July of 2015, at some point, the captain told him what he was going to do. And then the proposal comes out. But to explain, Warden Pierce talked about the internal review process. The captain, it's his responsibility to make the charges. He makes the charges out of all of the allegations. He decides what he wants to go forward with. And in this case, he presumably reviewed it. But what Warden Pierce explains is that there's an interchange between the human resource manager and the captain. The captain has to work with that human resource manager and come up with a... So are we supposed to assume that the captain sat on this for three years and never recommended to either of the other two earlier wardens that they take a particular action? Well, how do we know? I mean, if there was personnel being changed at the warden level, and if the captain typically might be talking to his boss, the warden, about disciplinary problems in the prison, maybe there's a back and forth, and there may be other cases that are being considered, and they're trying to balance all this out. Well, we don't know any of that, right? No, you don't know any of that. But what Warden Pierce did testify to is that there's an internal review process. The proposal decision, whatever decision is being contemplated, has to go to the regional office of the human resources branch, and then it goes to the national office of the human resources branch. And eventually, the decision goes out. Now, there's been no showing of any prejudice. There was never a request for these other individuals to testify. And what is required under Cornelius v. Nutt is a demonstration of prejudice, and there was no such demonstration before the arbitrator. I would just want to say a few words about the nature of the wrongdoing in this case. When Mr. Villareal finally admitted that he engaged in this misconduct, after denying it under oath to the office of inspector general, and then he finally admitted it after hearing the testimony of Warden Pierce that nothing he said to the inspector general made any sense. But all of the charges for removing him wasn't that he was untruthful? That's true. That's true. It was because of the cell phone calls. But what I wanted to point out, and Warden Pierce testified to this in his testimony, was the reason we have these rules in the prisons is because we don't want correctional officers manipulated by inmates. And the ironic thing in this case is that when Mr. Villareal finally told the truth to the arbitrator, what he said was, his excuse was, that I made these telephone calls, and I made them because at Houston, these inmates sometimes don't get appropriate medical treatment, and the inmates wanted me to call their friends and relatives and let them know that they needed medical treatment and that their relatives better come up and visit them. Well, what that shows, ironically, is that this officer was susceptible to the very dangers that the warden was concerned about. He was susceptible to being manipulated by the inmates and violating prison rules and regulations, just as the warden was very much concerned about. I think I might be over my time. You are. Thank you. Hello again. In regards to what the agency's counsel has argued before you, we are getting our brief, but I want to bring to your attention that at no time has the agency shown why Warden Babcock never issued a discipline during his tenure. They haven't shown why it was not available. They haven't shown that this process under Mr. Babcock was not completed. And in any event, the captain, even though the warden's changed, the captain was the same. There was no change of the first-line supervisor for the purposes of issuing a discipline. Well, but that means that the captain has to have recommended removal. That is correct. That is correct. For the purposes of that letter that was issued in March 2015, which was the first letter. Do you presume that his view from the get-go, from day one of the 1265, was that removal was appropriate? Well, it seems like the first decision or the first intention was to suspend him for 30 days. But that wasn't the captain. We don't know who wrote the 30-day suspension line. That is correct. But usually the draft is prepared for the captain, the immediate supervisor's signature. Right, he has to go up the line. Exactly, exactly. What your implication is, is that the captain once recommended something later and then later recommended something else? Under different wardens. And the agency has not shown why that happened. And the problem is that the people who had the knowledge had already retired at the time of the hearing. So there are all these questions as to whys and these hearsays. And at the end of the day, we have the termination of an employee. Did you make the argument in front of the arbitrator that, in fact, you were prejudiced by these retirements? We didn't. We made the argument to the arbitrator. We will never know because we don't have the benefit of the testimonies of these other people because they are retired. We cannot call them as witnesses. We presented that. And the unions never challenged that practice, right? It's been a longstanding practice of the Bureau of Prisons that once somebody is retired, they're treated as never having been around. We have challenged that. Have you challenged that in court? Before the arbitrators, I recently had a case where I asked the agency to produce an employee that had retired and they didn't. But you didn't ask that here? No, we didn't. We didn't. Did you say they did not produce them or they did? They never produced the employees. Only when the person benefits them. And I had a recent case in Miami that there was a retired warden and they brought the warden from retirement. So we have some cases that when they benefit the agency, they bring the retired employee. And in this case, the persons that were involved in the decision-making process. Because, listen, Pierce came when everything was said and done. The persons that were dealing with the employee during the period of time when the facts took place were retired. But they were the people that had the day-to-day interaction and knew the employee. Because as you notice from the brief, this is his first infraction. He never had a problem in the institution, not even before or while he was at the phone monitor. Yeah, but this is a lot of infractions. Huh? I mean, it's not like one infraction. It's when you say first infraction, it's like a whole host of infractions. Well, but when you look at it, Your Honor, that's one of the arguments that we have, the stacking of the deck. And actually, when I was, again, preparing for this argument, I was like, I wonder if Mr. Villarreal gave cookies to other employees. Or I wonder if Mr. Villarreal allowed other inmates to take showers early. We don't know because they only focus on these employees that the phone calls were made on their behalf. So when you look at the use of government computer, that wasn't sustained. The fact that there was a picture, well, he brought a picture of his daughter. The fact that the office was left open, that is standard operating procedure because the office, we had an inspection. You're out of time. But I'm sorry. That's OK. That's OK. All right. The case will be submitted. Thank you, Your Honor. Have a wonderful day and wonderful weekend.